IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**SCOTT M. GRACE**,

        Plaintiff,

   v.

**CITY OF GRANDVIEW HEIGHTS,
  OHIO,**

   and

**GRANDVIEW OFFICER CHAD LESTER**,        Case No. 19-3182

   and

**GRANDVIEW OFFICER WILLIAM FRESE**,      **COMPLAINT AND
                              JURY DEMAND**

   and

**CITY OF COLUMBUS OFFICER
  JOHN DOLLMATSCH,**

        Defendants.

**JURISDICTION**

1.     This is a civil rights action alleging police misconduct.  The case involves an illegal traffic stop, detention, and narcotics investigation of a law-abiding citizen, during which he and the vehicle were searched extensively.  The search revealed that there were no drugs of any kind present.  The Plaintiff alleges that the Defendants violated his rights guaranteed by the First, Fourth and Fourteenth Amendments to the United States Constitution, and supplemental claims under Ohio tort law.  The Court has jurisdiction

1

pursuant to 28 U.S.C. §§ 1331, 1343 and 1367(a).

## PARTIES

2.      Plaintiff Scott M. Grace is a 42-year-old citizen of the United States, and a resident of San Diego, California.  He has never been charged with or convicted of any crime.  He was raised in the Meigs County area.  His father is a minister and former District Superintendent of the United Methodist Church.  His mother volunteers in a hospice.  His parents now live in Grove City, and did at the time of this incident.

3.      Mr. Grace graduated from high school in 1995.  He then obtained a college degree.  He was admitted to the Capital University Law School, and he graduated from law school in 2004.  He was admitted to the Ohio bar in 2005, and he has been a practicing attorney ever since.  His older brother Todd is also an attorney, and for many years he has served as the Municipal Court Judge of Athens, Ohio.  Mr. Grace's younger brother Ryan is a minister in the United Methodist Church in Westerville, Ohio where he lives.

4.      After becoming an attorney, the Plaintiff remained in the Columbus area and began the practice of law.  He initially handled a large number of criminal matters by appointment, predominantly in Delaware, Ohio, mentored by friends who were older, more experienced attorneys.  He was hired by the Saia & Piatt firm, and then later recruited to the firm of Luftman, Heck & Associates where he became experienced as a debt resolution attorney.  The firm extended their practice to other states and in 2008 Mr. Grace was offered a position in their new San Diego office.  Mr. Grace accepted and has practiced there ever since.  After about 10 years of excellent work with the firm, in 2018 he opened his own firm, The Grace Law Group.  He is an expert in his field, has handled large and successful class-action litigation, and has spoken at legal trainings on topics related to debt

collection law and the Rules of Evidence. Mr. Grace is a member of the Ocean Beach Town Council and in that position he routinely works with, and on behalf of, the local police.

5. Defendant City of Grandview Heights, Ohio is a political subdivision of the State of Ohio. It is a duly authorized and established municipality located in Franklin County. It is and was at all times relevant the employer, master and principal of Defendants Lester and Frese.

6. Defendants Lester and Frese are and were at all times relevant police officers for the City of Grandview Heights, and employees, servants and agents of that City. They were at all times relevant acting within the scope of their employment and under color of state law. They are sued in their individual capacities.

7. Defendant Dollmatsch is and was at all times relevant a police officer for the City of Columbus, Ohio, and an employee, servant and agent of that City. He was at all times relevant acting within the scope of his employment and under color of state law. During this incident he was additionally acting as an agent of the City of Grandview. He is sued in his individual capacity.

## FACTS

### (1) Mr. Grace's Trip Home for the Holidays

8. Although Mr. Grace loves living and working in San Diego, he makes multiple trips home each year to maintain close ties and contacts with his family and friends in Ohio. The incident giving rise to this litigation occurred during one of those trips home.

9. For many years, as the extended Grace family had grown, moved to different areas, and had families of their own, it had become more and more difficult for the entire

3

group to all get together at the same time for the holidays.  For this reason, they devised the Grace family tradition of "Thanksmas".  This was a date selected each year, usually close to Thanksgiving, when all of the family could be available for a day or two to celebrate both Thanksgiving and Christmas.  They gathered, ate together, exchanged their Christmas gifts, and had a relaxed and leisurely time to enjoy each other's company without the competing activities and commitments of the holiday season.  The Grace family had done this for many years.  It was an important annual event, a highlight of their year which they planned and looked forward to.

10.     Mr. Grace's "Thanksmas" trip home in 2017 encompassed the dates of November 21-27.  He flew into Columbus on November 21, and he was picked up at the airport by a friend of more than 15 years named Scott Florence.  Mr. Florence owns a construction company, and lives in Westerville near the Plaintiff's brother.  They left the airport, and went to Mr. Florence's home.  As he had on previous "Thanksmas" visits, Mr. Florence loaned Mr. Grace one of his vehicles, a chrome-colored 2011 Hyundai 4-door, to drive during his time in Ohio.  The Plaintiff drove to his parents' home in Grove City that night and stayed with them.

11.     The next day, Wednesday, November 22, the entire extended Grace family gathered at the home of Plaintiff's parents for their Thanksmas celebration.  It lasted all day. The Plaintiff played with nieces and nephews, spent time with his brothers and parents, exchanged early Christmas gifts, and generally had a wonderful day.  He consumed no alcohol during the day.  After the party, Mr. Grace was scheduled to meet with old friends at a restaurant, stop to see another friend briefly in Grandview, and then drive to Athens County where he would spend the night with his older brother.  Early the

4

following morning, Thanksgiving, he planned to go bow-hunting in a private woods nearby. Mr. Grace would then return to Columbus for the weekend before heading back to California. These were the Plaintiff's plans when he left his parents' home that Wednesday evening.

12. Mr. Grace loaded his luggage, including Christmas presents, into the trunk of the car and drove to Polaris Mall. He met with a group of attorney friends for dinner and to catch up on each others' lives. Mr. Grace consumed no alcohol whatsoever during dinner.

13. After dinner Mr. Grace drove south. His next stop was the home of another old attorney friend named Craigg Gould. Mr. Gould lives in Grandview Heights, on Grandview Avenue. Mr. Grace had the address and was generally familiar with that area, but he had not been to Mr. Gould's residence there before.

14. Mr. Grace drove to the vicinity of Grandview Avenue where his friend lived, and began driving slowly and looking for the address. He was initially unable to identify the house numbers because it was dark. When he did see a number, he had already passed the address. Mr. Grace then circled around, in a lawful manner, using his turn signal at each turn, and tried again. As he came back the other way on Grandview he was still having difficulty seeing house numbers. He pulled off Grandview Avenue onto a side street called Mulford Road where he stopped and input the address into Google Maps on his cellphone. Mr. Grace felt it was safer to use his phone from a stopped position than to try and locate the address while driving.

15. He found the address on his phone app and it was just across Grandview Avenue from where he was stopped. He turned and could see the house. Mr. Grace then

drove up Mulford Road and circled around to Grandview Avenue intending to pull into Mr. Gould's driveway and park. As he drove toward the house he decided that it would be better if he found a parking space on the street so as to avoid anyone being blocked in the driveway. He had seen several openings in the parking area along the curb on Mulford so he returned to Mulford Road, again using his signals before every turn.

16. As he drove back toward Grandview Avenue on Mulford Road he was in the one and only lane of travel heading that direction. He saw intermittent parked cars and open spaces in the parking area along the curb to his right. When he got near Grandview Avenue he drove straight in to a curbside parking space and stopped behind another parked car. He turned off his engine, intending to get out and walk across Grandview Avenue to Mr. Gould's house. Before he could do so, however, a Grandview Heights police cruiser pulled up behind him and activated its flashing lights. Mr. Grace had no idea why these officers had pulled behind him and activated their lights. Mr. Grace remained in his vehicle. Defendants Frese and Lester were in the police cruiser.

### (2) The Unlawful Traffic Stop

17. On the night in question Officer Frese was a new officer on the Grandview Heights Police Department, in his first two weeks of training, but he was not a novice to police work. He had come to Grandview after ten years on the Cincinnati police force. He was riding with Officer Lester so that Lester could train him on the way things were done in Grandview. This stop occurred only blocks down the street from the Grandview police station. The officers conducted this seizure together, as a team.

### (a) The Initial Conversation

18.     The entire event was recorded on the dash-cam audiovisual system, although there were some conversations which were either not recorded or are inaudible. Defendants Lester and Frese pulled up behind Mr. Grace's parked car and initiated their flashing lights at 9:06:51 p.m. Since the police video system uses military time we will do so as well, meaning that this seizure began at 21:06:51 hours.

19.     Before leaving their cruiser to approach Mr. Grace, Officer Frese called in the license plate for a check, stating "It's gonna be . . . George-Boy-George-7067." The dispatcher responded, "All right, copy." That license plate was properly registered to the car's owner Scott Florence. Defendant Frese conducted this license plate check 31 seconds after the stop began.

20.     The officers then approached Mr. Grace seated in his vehicle. Mr. Grace rolled his window down all the way in order to speak with the officers. Officer Frese went to the drivers side, stood immediately next to the driver's door, and lowered his head toward the open window to speak to Mr. Grace. At the same time, Defendant Lester walked to the passenger side of the car and shined his flashlight into the car, inspecting the interior through closed windows. They began their conversation with the Plaintiff at 21:07:42.

21.     Mr. Grace explained to the officers that he had turned and come around twice before coming back to park because he was looking for an address. He had located it right across Grandview Avenue from where they were speaking, and then he had returned to this spot to park. In response to questions by Officer Frese, Mr. Grace gave the address where he was going, pointed out the house, and explained that he was from out of town

and was visiting a friend there.  This intersection of Mulford Road and Grandview Avenue is just south of a busy commercial district with a movie theatre and numerous restaurants and businesses open at that time of day, and there was nothing unusual or suspicious about drivers circling the adjacent blocks in that area seeking a parking space.

22.     Defendant Frese asked Mr. Grace if this was his car.  The Plaintiff told him that it was not his car, and explained "it's my friend's car . . . it's loaned to me . . . I'm in from San Diego."  The officer did not ask for the name of the owner, their address, or any further details.  The license plate check had provided this information.

23.     Next Defendant Frese asked if Mr. Grace had a drivers license on him, Mr. Grace said yes, and the officer asked to see it.  Mr. Grace handed it to him immediately.  Frese asked whether the car had insurance on it.  Mr. Grace responded "I've used it whenever I come to town, so I assume."  The Plaintiff reached to the glovebox in order to retrieve the registration and proof of insurance papers, but Frese stopped him from doing that, raising his voice and stating "hold on a second, hold on a second."  Mr. Grace complied.

24.     Defendant Frese asked what Mr. Grace had been doing that day, and the Plaintiff explained that he had been "hanging out with my parents for Thanksgiving."  Frese asked "you had anything to drink tonight?"  Mr. Grace responded, truthfully, "I've had zero . . . just water . . . I was just hangin' out up in Polaris at Benihana."  The officers asked no further questions during this conversation.  The officers gave Mr. Grace no explanation of why they were detaining him.  They never mentioned turn signals, or the Plaintiff's use or non-use of turn signals.  They told the Plaintiff they had to "check him out" and that he should "sit here tight," and they both walked back to their cruiser at 21:09:55.

8

25.     That first conversation between the parties lasted just over 2 minutes. Officer Frese had asked 10 questions, all on topics incidental to a traffic stop.  By the time it was finished the officers had called in the vehicle license plate, and received Mr. Grace's driver's license.  Mr. Grace had explained his driving activities and his destination.  He had explained that the car belong to a friend, that he had authority to drive it, and he believed it was insured.  He had attempted to show them the proof of insurance and registration but they were not interested.  He had told the officers he had consumed no alcohol, and they apparently believed him because they never mentioned alcohol again. All that remained to complete the traffic stop was to have the dispatcher verify the validity of Mr. Grace's drivers license, and then write the ticket and give it to him with the accompanying instructions.  But this is not what happened. As the officers walked back to their cruiser, they were already envisioning a criminal investigation entirely unrelated to any traffic violation.

### (b) There Was No Probable Cause for a Traffic Stop

26.     This stop subsequently turned into a seizure lasting close to an hour, as described in more detail below.  About 45 minutes after detaining Mr. Grace, the officers had the following conversation about what traffic violation they could charge him with:

| | |
|---|---|
| Frese: | I was gonna use, uh . . . I was gonna use 331.08 . . . lane violation . . . or is . . . do I have to use something with a turn signal? |
| Lester: | I'd use fail to signal. |
| Frese: | Fail to signal? |
| Lester: | Yeah. |
| Frese: | All right.  I didn't . . . |
| Lester: | Let's see what we've got. . . Yeah (inaudible) So he's not using a signal, uh . . . |
| Frese: | 313.01 says . . . I didn't . . . I saw that one earlier . . . says traffic signal, but . . . |

9

| | |
|---|---|
| Lester: | Nah . . . but try 331.14, says signals improper before changing lanes, |
| Frese: | Okay . . . all right . . . all right . . . thank you. |
| Lester: | Good. |

Thus, after considering two other possible ordinances, Defendants Frese and Lester decided to charge Mr. Grace with violating City of Grandview Heights Traffic Ordinance 331.14.  A copy of the citation is Attachment No. 1.

27.    In fact, Mr. Grace had committed no traffic violation.  Defendants Frese and Lester had not seen Mr. Grace commit a traffic offense.  Their traffic stop was conducted without probable cause.   Their subsequent traffic citation was also brought without probable cause.

28.    City of Grandview Heights Traffic Ordinance 331.14, is essentially identical to the statewide traffic offense contained in Ohio Revised Code §4511.39.  The offense requires in pertinent part that a driver must use a turn signal, for at least 100 feet, before moving to the "right or left upon a highway".  Full copies of both the city ordinance and the state statute are provided as Attachment No. 2.

29.    The City of Grandview Heights Traffic Ordinance includes a definition of the meaning of the word "highway" as used therein:

301.42 STREET OR HIGHWAY . . .
(a) "Street" or "highway" are synonymous and mean the entire width between the boundary lines of every way open to the use of the public as a thoroughfare for purposes of vehicular travel.

The state statute similarly defines the word "highway".  O.R.C. §4511.01(BB).  Copies of both the city and state definitions are provided as Attachment No. 3.  This offense is not ambiguous.  It is limited to lane changes "upon a highway", which is a "way open to the use of the public as a thoroughfare for purposes of vehicular traffic".  But the area designated

10

and used for parking next to the curb on Mulford Road was not open to the use of the public as a thoroughfare for purposes of vehicular travel. The officers drove past sixteen (16) other cars parked along the curb to their right on Mulford before they reached Mr. Grace, and they knew that the parking lane was not a thoroughfare open for purposes of vehicular traffic. Mr. Grace's failure to activate his turn signal for a minimum of 100 feet before stopping at the curb was not illegal.

30. A police officer must have probable cause in order to conduct a traffic stop. Since Defendants Frese and Lester lacked probable cause, the entire seizure of Mr. Grace thereafter was a violation of the Fourth Amendment prohibition against unreasonable searches and seizures. Similarly, their traffic charge against Mr. Grace violated the Fourth Amendment. The outcome of the traffic case reflected a recognition that the charge was baseless. The prosecution had the entire event recorded on a dash-cam video. Nevertheless, when Mr. Grace arrived for trial the case was "dismissed at the request of the prosecutor". Even the court costs were dismissed. The dismissal is appended hereto as Attachment No. 4.

### (3) The Officers Unconstitutionally Prolonged the Traffic Stop to Conduct a Criminal Investigation

31. Even if Defendants Lester and Frese had actually observed Mr. Grace commit a violation of the traffic laws, which would have rendered their initial traffic stop reasonable, the actions of these officers during the detention would have changed it to an unlawful seizure very shortly after it began. A seizure justified only by a police-observed traffic violation becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation and making the ordinary inquiries

11

incident to the traffic stop. Police officers must diligently pursue the completion of their justification and purpose for the seizure, which is issuing the traffic citation. The seizure may lawfully last no longer than is necessary to effectuate that purpose. The officers may not conduct unrelated criminal investigations in a way that prolongs the stop, absent the reasonable, articulable suspicion of crime ordinarily demanded to justify detaining an individual. Defendants Frese and Lester violated every one of these constitutional mandates.

### (a) Initiating a Drug Investigation Instead of Issuing a Traffic Ticket

32. As they returned to their patrol car, Officers Lester and Frese immediately revealed the real reason they had pulled up behind Mr. Grace and initiated a detention. The moment they walked away from the Plaintiff their focus turned to conducting a drug-related investigation. The very first words spoken between the officers after leaving Mr. Grace were these:

| | |
|---|---|
| Lester: | How's he acting? |
| Frese: | What's that? |
| Lester: | How's he acting? |
| Frese: | He's a little fidgety . . . |
| Lester: | Yeah. |
| Frese: | . . . but I really don't get any odor. |
| Lester: | He's got an air freshener. |
| Frese: | Does he? |
| Lester: | Down on his parking brake pedal. |
| Frese: | Okay. |
| Lester: | Down there . . . so . . . |
| Frese: | That's a little weird. I didn't catch that. |
| Lester: | You, you probably couldn't see it from where you were . . . So I'd go ahead and call him in, and then uh, let's pull him out and question him and see if we can get consent. |

This discussion between the officers lasted only 23 seconds, from 21:10:23 to 21:10:46.

In that brief exchange they had decided to conduct a drug-related investigation, to question

12

Mr. Grace about criminal activity, and to attempt to obtain his consent for them to search the vehicle. These decisions were made just 3 minutes and 4 seconds after the officers had started speaking to Mr. Grace at his car window.

33.    Critically, the officers did not discuss whether Mr. Grace had committed a traffic offense, or what that offense might have been, or whether they should issue a citation.  They never even mentioned anything related to traffic enforcement.  They had completely detoured from what they would later claim was their purported mission, citing Mr. Grace for a turn signal violation.  In the midst of planning their criminal investigation Defendant Frese did remember to call in the Plaintiff's drivers license, but the officer's attention was elsewhere and he mistakenly read the driver's license number incorrectly to the dispatcher.  When the dispatcher radioed back to get the correct information, the Defendants' response was a telling statement of their priorities:

Lester:      You think something's up?
Frese:       He . . . he's a little squirrelly, so . . . I'll just have him step out, come to the back, and then . . .
Lester:      Do me a favor.
Frese:       What's that?

 [dispatcher calls back asking for the accurate operators license number]

Lester:      Just tell her . . . I'll re-run it here in a second, go ahead and see if she can, see if she can call the canine too.
Frese:       Three-three-four, is there any way . . . can you start us a canine?
Dispatch:    Okay.

The request for a drug-sniff dog was made at 21:12:21.  That was 4 minutes 39 seconds after the officers had initially approached Mr. Grace to speak with him.

34.    Defendant Frese then exited the cruiser and approached Mr. Grace's vehicle again.  Defendant Lester re-ran the drivers license, giving the correct number this time, and

13

the dispatcher called back 10 seconds later: Dispatch: "Okay, I was missing one number . . . got a Grace, or Scott Michael Grace . . . Gonna be valid out of California."  The verification that Plaintiff had a valid license came at 21:12:55, or 5 minutes 13 seconds after the officers had first spoken to Mr. Grace.  The officers now had all of the information about the Plaintiff and the vehicle necessary to complete the traffic citation.  Either of the Defendants could have started that task immediately.  However, neither officer began to write a ticket at this point.  Officer Lester got out of the cruiser, walked up to join Frese at Mr. Grace's vehicle, and both officers participated in conducting their planned drug investigation.

### (b) The Officers' Second Conversation With the Plaintiff

35.    While the Defendants were away from his car, Mr. Grace had opened the glovebox and found the vehicle registration and the proof of insurance document which belong to the owner Mr. Florence.  Mr. Grace had those in his hand ready to show the officers when they returned.  Plaintiff also had his cell phone in hand, which contained Mr. Florence's telephone number in the event they wished to speak with the owner and verify that Mr. Grace was authorized to have the vehicle.  The Plaintiff still had no idea why these policemen were detaining him, but he was about to find out.

36.    Defendant Frese came to the driver's door, Mr. Grace rolled the window down and began to hand the documents out to the officer.  Frese was not interested, and told the Plaintiff to leave those things in the car:

Frese:      You can leave everything right there, I'm just gonna have you
              step out of the vehicle for me.
                   [Mr. Grace immediately complies]
Frese:      Stop right there . . . you're good right there . . . just wanna . . .
              keep your hands out of your pockets there for me. . . I just

14

| | |
|---|---|
| | want to ask you a couple questions real quick. . . |
| Grace: | All right. |
| Frese: | All right. . . there is a . . . is there any . . . anything in this car that shouldn't be? |
| Grace: | No.  Not that I'm . . . I mean it's his car. . .there's a baby seat, and . . . |
| Frese: | Nah, now I understand all of that, but you've also got an air freshener, uh, down on the floor down there, and that indicates . . . |
| Grace: | I got nothing. |
| Frese: | Okay. |
| Grace: | I got . . .  Got stocking stuffers. |
| Frese: | Okay, well you know it's kind of suspicious that you're driving around in somebody else's car. |
| Grace: | You can call him if you want.  I've got his phone number, you call talk to him. |
| Frese: | Okay. I mean, we don't . . . we don't need to go to that route just yet, but um . . . so basically, what I'm trying to get to . . . is uh, will you allow me consent to search the vehicle? |

37.     The conversation quoted above occurred as the two officers stood close to

Mr. Grace at the rear of the car.  Neither officer gave any indication as to why it would be

suspicious for a man from California, visiting Ohio, to be driving a local resident's vehicle.

Mr. Grace's explanation was entirely logical and plausible.  But when the officers refused

Mr. Grace's offer to put them in contact with the owner and assuage any questions they

might have about his authority to be driving the vehicle, the Plaintiff saw that they were just

creating an excuse to search the car. This troubled Mr. Grace.  He began to respond that

he was not comfortable consenting to a search of Mr. Florence's Hyundai, but he only

completed part of one sentence before the officers cut him off. Mr. Grace said, "It's not my

vehicle to give you consent to search, there's nothing to search. . .", and at that point the

officers, in a louder and more aggressive tone, interrupted him:

| | |
|---|---|
| Frese: | Okay, just timeout, timeout, timeout, it is your vehicle. |
| Lester: | Hey, partner, take your hands out of your pockets . . . is there anything on you we need to know about at all? |

15

| Grace: | No, there's nothing.  I've done . . . what have I done?  Is there something going on? |
|---|---|
| Lester: | What we're getting at is . . . there's stuff about your actions, and the way stuff's in the vehicle that leads us to believe that there may be something in the vehicle that's not legal . . . all right . . . you said there's nothing illegal, there's no . . . |
| Grace: | There's nothing. . . |
| Lester: | . . . there's no weapons, no drugs, nothin like that? |
| Grace: | There's a bow and arrow in the trunk.  I'm supposed to go bow hunting at my property back in Washington County tomorrow morning. |
| Lester: | Okay. |

38.　At this point, a third Grandview Heights officer arrived on scene in another cruiser, Officer Garner.  She walked up and joined the others.  There were now three Grandview officers present, in a group, involved in the ongoing inquiry of Mr. Grace concerning narcotics and searching the car.  Any one of them could have been preparing a ticket for Mr. Grace, while the others stayed with the Plaintiff.  Nine (9) minutes had now passed since the beginning of the seizure, but no one had even begun to write a traffic citation.

39.　The officers would not take "no" for an answer.  They continued to argue with Mr. Grace in an effort to get him to consent to a vehicle search.  Examples of their repeated requests included these exchanges:

| Lester: | . . . we're, we're doing our job . . .and there's some indicators that make some things look suspicious . . . you're driving the vehicle, so we're asking you if you'll give us consent to search the vehicle or not. |
|---|---|
| Grace: | For what? |
| Lester: | So we can dispel our suspicion that anything illegal's in there. . . |
| Grace: | I don't understand, I just . . . I don't understand what in the world's going on. . . |
| Lester: | Your actions, and the way stuff is in the car, leads us to believe that there's . . . there might be something illegal in the vehicle, we want to . . . |

16

Grace:          There's nothing illegal in the vehicle.

During this request for consent quoted above, the dispatcher notified the officers that "we have a K-9 en route from Fisher and McKinley, CPD," and Frese responded "Copy that.".

40.     Mr. Grace began to comment about the amount of time he was being held. He was at all times courteous and respectful, never raising his voice, cursing, or being resistive in any way, but he did point out that "I've got a friend who's waiting on me right now", and "I've got my brother waiting on me down in Athens."   Defendant Frese responded by suggesting Mr. Grace should consent to a search:

Frese:          And we understand that, okay . . . we're not trying to hold you
                up anymore while you're trying to go, okay, and so, like I said,
                you're the operator of the vehicle, which makes you have
                consent . . . you can give consent if I can search the vehicle .
                . .if you know there's something in there, then I need to know
                about . . .
Grace:          There's nothing in there, there's a bow and arrow in the trunk
                . . . there's luggage from San Diego . . . That's it, and there's
                stocking stuffers and there's Christmas presents I just opened
                from my parents. . .
Frese:          Okay, so will you give me consent to search the vehicle?

41.     The officers had now requested four times that the Plaintiff agree to a search of the car, and Mr. Grace had declined each time.  After being asked again, he told the officers "I don't see why in the world . . . I don't understand why that there's any reason to drag this on anymore. I'm not driving illegally, I'm not parked illegally . . . I don't understand this."  In response, both officers began to explain their basis for detaining Mr. Grace, but their excuses were inconsistent.  Officer Lester brought up the turn signal theory for the first time:

Lester:         Do you not recall not using your turn signal to park on the curb
                here? . . .
Grace:          I mean it's . . . is that what, are you guys stopping me . . . to

17

> write me a ticket for not using a turn signal when I pulled in straight?
>
> Lester:    Yeah, my partner's gonna go back and write you a ticket for fail to signal.

42.    But Officer Frese simultaneously gave a <u>different</u> explanation for the detention of Mr. Grace. He attributed it to a suspicion of the possibility that Mr. Grace had stopped at the curb to avoid the police for some reason: "When I came this way, you whipped it to the curb . . . you stopped." The Plaintiff explained that he had stopped at the curb to locate his friend's house on his phone, "cause I don't wanna use my phone while I'm driving, that's my understanding of what's legal." Officer Frese persisted:

> Frese:    Did you see us get behind you again? Before you went to the curb again?
>
> Grace:    No, I turned around up there, and then went that way and came back and tried to find it . . .
>
> Frese:    I understand all that, but I've told you why . . . I've told you why I stopped you.
>
> Grace:    Because I . . . understand that I was looping around the block . . . I get that . . . I understand that . . .
>
> Frese:    So you don't think it's a little suspicious that when the police come by (simultaneous talking) . . .
>
> Grace:    I don't think there's anything suspicious at all.

43.    In addition to the amount of time that was passing, and the repeated requests to pressure Mr. Grace into giving consent for a search, there was another important factor which made the method of this detention highly coercive toward the Plaintiff. It was extremely cold outside. One of the police reports recorded the temperature at 28 degrees during this interrogation. Mr. Grace had a winter coat inside the car, but when the officers took his license and went to the cruiser to check it, the Plaintiff did not put his coat on. He did not know that he was going to be standing outside for an extended period of time. After ordering him out of the car, the officers would not permit him to go back into the car to

18

retrieve his coat.  They would not even permit him to put his hands in his pockets for warmth.  When Mr. Grace told them he was uncomfortable, Frese (who was wearing gloves himself) just brought up the officers' wish that he consent to a search:

Grace:    . . . I'm freezing.

Frese:    It's a little cold, and I understand that, but just don't put your hands back in your pockets there for me please . . .

Grace:    I'm trying not to but it's cold . . .

Frese:    I want you to just know, I've got a drug dog coming . . .

Grace:    Okay.

Frese:    . . . okay, and I've already gone through with it . . . just to . . . you know . . . to try to get verbal consent from ya just to search the car.

Grace:    What in the world is the . . . I don't see any reason to search the car, or whatever . . . but for what?

Frese:    . . . I've already given you three indicators . . . You're, you're fidgeting. . . your furtive movement . . . you've got an air freshener in there on the floor, which to me indicates that somebody has either used marijuana in your vehicle, or . . . used marijuana in the vehicle before, and then when the police arrive, you started getting a little too, uh fidgety like that . . .

Grace:    How so?

44.    At this point the supervising officer Defendant Lester became impatient. He decided to make their intentions clear to Mr. Grace.  They were not going to let him leave until they had completed their criminal investigation.  If he didn't give consent, then he would be required to stand in the cold, in custody, for however long it would take for the dog to arrive and check the car.  In a firm and authoritative tone, Lester gave Mr. Grace this explanation of his situation:

Lester:    Let me, let me explain something. . . I've been doing this a long time, all right . . . and there are certain indicators that make us think that it is possible that there's something illegal in the vehicle, all right. . . so we're gonna do what we have to

19

> do to verify that, and there's two ways we can do that. We can either get consent from you to search, and dispel our, our suspicions, or we can wait for the drug dog to get here and see if he indicates on the car . . . all of the indicators here that my partner here has told you about . . . these are things that in our experience. . .

Grace: I don't want you guys tearing my buddy's car up.

Lester: . . . are indicators of drug trafficking. . .

Grace: of drug . . .of drug trafficking?

Lester: Of drug trafficking or possession.

Grace: I mean, my buddy across the street is an attorney, should I have him come over here and then you, you guys can search the car?

Frese: We can . . . you can talk to him as soon as we're done with this, okay.

Grace: I mean, how long is this gonna take, what are we talking about?

By stating that they were "gonna do what we have to do to verify that", and that they were either going to "get consent from you to search" or "wait for the drug dog to get here," these police officers made an <u>explicit</u>, <u>candid admission</u> that they intended to delay this detention until the K-9 Unit arrived and conducted a drug sniff.

45.     After hearing Defendant Lester say that they suspected him of "drug trafficking", Mr. Grace began to feel fearful of the officers. There was no logical reason for the officers to have such a suspicion under the circumstances. The Plaintiff started to worry about his personal safety, and he became wary that the Defendants were intending to frame him for drug trafficking. He tried to remain calm, but he knew that he could not grant them consent to search, out of fear that they were going to plant evidence in the vehicle.

46.     Next, Defendant Lester made another proposal to Mr. Grace in the hopes of securing permission for a search. If the Plaintiff waived his constitutional rights, they would not give him a traffic citation, but if he did not waive his rights, they would cite him:

20

Lester: If you want to give us consent to search the vehicle, he'll . . . my partner'll look through it real quick, and if he doesn't find anything then we're done, then you go on your merry way.

Grace: I don't like how I'm being forced into this, I don't . . .

Lester: You don't have to give us consent. Our other option is, my partner goes back and writes a ticket for fail to signal while we wait for the drug dog to come here. If the drug dog indicates on the car, then we'll search it anyway.

Frese: Do you understand your options?

Grace: No. I don't understand. . . I feel like I'm . . .I don't know why I'm being interrogated for drug trafficking.

47. Officer Lester asked Mr. Grace, "do you use drugs at all?" The Plaintiff said "no". Officer Lester asked Mr. Grace, "does your buddy who owns the vehicle, does he use drugs at all?" The Plaintiff said, "No. He's married with two kids, and he's in . . . St. Clairsville right now for his wife's family, with his four and two year old daughter and son."

So Defendant Lester tried a different approach:

Lester: But, again, in my experience, somebody who knows that there's nothing illegal in the vehicle, isn't as nervous about giving the police consent to search.

Grace: First, you're sitting there talking about writing me some ticket for something that I don't even think is illegal . . .

Lester: You don't think not using your turn signal is illegal?

Grace: To park when you're pulling in straight? No, I don't really think I did anything wrong there, to be totally honest. I don't understand . . . what this is all about. I feel like once you guys started . . .

48. The Defendants had now suggested that Mr. Grace should consent to a search, and/or directly requested it, eight different times. He had continuously declined to do so.

Officer Frese tried one last argument in the hope of achieving that result:

Frese: If you were the owner of this vehicle . . .

Grace: I'm not the owner of this.

Frese: . . . then you would let me search this car?

Grace: Yeah. . . Absolutely.

Frese: But since it's someone else's vehicle, that's . . . that's your major point of contention?

21

Grace:     It's not my vehicle, yeah.
Frese:     Okay. You're driving around in it, and you're, technically have ownership of it.
Grace:     I'm in possession of it, I don't own the car. . .
Frese:     In our opinion you have ownership of the vehicle while you're driving the vehicle, controlling the vehicle . . .
Grace:     Can I have my friend, who's an attorney, come over her while we do it?
Frese:     We already explained this to you.
Grace:     What's the reason? What's the . . .
Lester:    Let me tell you what . . . go ahead and start writing him his ticket, and I'll . . .

49.     At this juncture, Defendant Frese walked back to the cruiser.  This occurred nineteen (19) minutes after the detention of Mr. Grace had begun.  At the same time, Defendant Lester moved much closer to Mr. Grace, and got face-to-face with the Plaintiff. He spoke to Mr. Grace in a manner that the Plaintiff felt was intimidating, and this conversation was not recorded by the dash-cam.  Lester told Mr. Grace, "Let me tell you. Listen.  We can do this the easy way, or we can do this the hard way."  Plaintiff asked him what he meant by that.  Lester said that Mr. Grace could either give consent to search the car or they would bring in the drug dog, and "once the drug dog indicates on the car" they were "going to search it anyway".  The Plaintiff requested of Defendant Lester that, since they were going to make him wait in below-freezing weather for the drug dog to search the vehicle, would he at least allow Plaintiff to put on his jacket from the back seat while he waited.  Officer Lester told Mr. Grace "you had your chance to comply," and refused his request.

50.     About two minutes later, the Columbus Police K-9 unit drove by.  Seeing this, Defendant Lester took Mr. Grace from the area behind the car over onto the grass adjacent to the sidewalk.  There he ordered the Plaintiff to put his arms behind his back.  Lester

22

pulled the hands together, turned Plaintiff's wrists so the hands pointed up, and then lifted the Plaintiff's hands and arms upward against Mr. Grace's back. He held them in that position while he did a full-body pat-down search from top to bottom. This search was unlawful. The officers had been with Mr. Grace for over 21 minutes at this point. Neither officer had said or done anything to suggest that they felt Mr. Grace might be armed and dangerous, and there were no facts or circumstances which would suggest that was the case.

### (c) There Was No Reasonable Suspicion To Detain Mr. Grace for Criminal Wrongdoing

51.     Police officers may not conduct unrelated checks during an otherwise lawful traffic stop in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual. If officers wish to extend a traffic stop in order to engage in a criminal investigation, they need reasonable suspicion that the individual has engaged in criminal conduct. Reasonable suspicion is more than an ill-defined hunch. It must be based upon a particularized and objective basis for suspecting the particular person of criminal activity. For an officer's suspicion to be reasonable they must point to specific and articulable facts supporting their suspicion.

52.     Whether an officer did or did not have reasonable suspicion of criminal activity is based upon the totality of the circumstances. This includes facts and circumstances that are exculpatory. Police officers cannot rely on relatively minor factors that are subject to significant qualification, or factors that are common, innocuous, and innocent behaviors, in attempting to establish reasonable suspicion. In this case, Defendants Lester and Frese lacked reasonable suspicion to detain Mr. Grace. The

factors cited by the officers here were not sufficient to create a reasonable suspicion of the drug offenses that these Defendants investigated. When Frese and Lester diverted from engaging in a traffic stop in order to conduct an unrelated criminal investigation, they did so without adequate legal justification.

53. Throughout the course of their detention of Mr. Grace, the Defendants told him repeatedly "your actions and the way stuff's in the car" made them suspicious. The Grandview police officers mentioned a total of four (4) factors which they claimed were suggestive of drug trafficking and/or drug possession. The officers claimed that these factors were the basis of their reasonable suspicion. Those four circumstances were as follows:

(1)     Mr. Grace was "a little fidgety", or "a little squirrelly";

(2)     There was an air freshener in the car, and it was located down on the floor;

(3)     Mr. Grace was driving someone else's car; and

(4)     Mr. Grace pulled to the curb briefly, then circled around the block, came back the opposite way and pulled to the curb to park, and did these driving maneuvers with a police cruiser nearby

We will address these items in order.

54. It was only Officer Frese who described Mr. Grace as "a little fidgety" and "a little squirrelly". Frese said these things immediately after their first brief conversation with the Plaintiff. Frese never explained what he meant by those words. He never elaborated by describing any statement, action or trait of Mr. Grace which he felt had been fidgety or squirrelly, or which led him to describe the Plaintiff in those terms. Without some substance or specifics to support them, these words are nothing more than vague,

24

subjective and conclusory negative characterizations.  They are not indicative of any objective fact or circumstance, much less a suspicious one.

55.     Neither Defendant Lester nor Defendant Frese ever once used the word "nervous" to describe Mr. Grace, or to justify their purported suspicion that he was engaged in criminal activity.  It would be pure speculation to suggest that this was what Frese meant by "fidgety" or "squirrelly".  However, Mr. Grace was not, in fact, acting in a nervous manner toward these officers.  Mr. Grace had been entirely calm, cooperative, pleasant, and forthcoming with information responsive to Officer Frese's inquiries.  He made eye contact, he was not evasive, and he did not show any unusual breathing or perspiration or other physical signs police officers sometimes point to as evidence of nervousness.  Morever, courts have consistently held that "nervousness" is generally an unreliable indicator of criminal misconduct, especially in the context of a traffic stop.  So in the event that Officer Frese was attempting to describe something akin to nervousness, that claim would have been both false, because Mr. Grace was not acting nervously, and inconsequential as a matter of law.

56.     The second factor cited by the Defendants as grounds for reasonable suspicion was the presence of an air freshener in the vehicle, and its location on the floor. Those facts are not disputed.  Although the Plaintiff did not put it there, and had not even noticed it before the officers brought it up, it is true that there was a single air freshener on the floor of the front seat of the vehicle.

57.     Defendant Frese told Mr. Grace that "you've got an air freshener in there on the floor, which to me indicates that somebody has . . . used marijuana in your vehicle". Defendant Lester said that the air freshener on the floor was an "indicator that makes us

25

think it is possible that there's something illegal in the vehicle." The Defendants' attempt to base reasonable suspicion of crime upon the air freshener is completely groundless, factually and legally. Neither Defendant even claimed that this single air freshener was emitting any odor that they could detect. Neither officer gave any explanation as to why the location of the air freshener on the floor, rather than hanging from the rear-view mirror, for example, rendered it more suspicious. Logically, a person using an air freshener to mask an odor might prefer the freshener to be hanging up where it could actually do that job. A person seeking to mask a drug odor might have multiple scented items, or unusually strong scented products, not just a single, normal-sized car air freshener of the type available in countless retail outlets. The presence of a baby seat in the vehicle provided an entirely lawful explanation for the presence of an air freshener which was more logical than the criminal motive the officers were attempting to suggest.

58.     Most important of all, however, the totality of the circumstances included this undeniable fact. When the officers first approached Mr. Grace in the vehicle, and Frese had conducted his initial traffic-related questioning, they saw no potentially drug-related paraphernalia, no alcohol containers, nothing suggestive of drug or alcohol use. Mr. Grace had rolled his window all the way down. Defendant Frese had positioned himself facing the car, immediately adjacent to the open driver's window, and he had leaned toward the window to speak to the Plaintiff. Frese had remained in that posture, face-to-face with Mr. Grace, only inches from the car interior, for a couple of minutes while they talked. During that entire interaction Defendant Frese admittedly did not notice any odor of marijuana at all, not even what officers sometimes describe as "a faint odor". And Frese told this fact to Defendant Lester as soon as they got in the cruiser. Both officers just decided to ignore

this powerfully exculpatory fact. Only 17 seconds after Frese told Lester "I really don't get any odor," the officers decided to "pull him out and question him and see if we can get consent". And only 27 seconds after that decision, they decided to call for a drug dog to come to the scene.

59.     As law enforcement officers, Defendants Frese and Lester knew or should have known that the mere presence of an air freshener could not be used as a basis for reasonable suspicion of drug crimes. For many years prior to this incident, Ohio courts had repeatedly held that the presence of an air freshener inside a car, whatever its location at the time of the stop, is not a factor that would distinguish that detainee from the vast majority of innocent drivers on the highways who have air fresheners in their vehicles. Even a "strong smell" or "immense odor" of air freshening products, or "air freshener galore," or "a bottle of air freshener in the glove compartment," all have been held to be innocuous facts, which did not support a reasonable suspicion of drug crimes. But the Defendant officers were not deterred by existing legal precedent.

60.     The third factor relied upon by the officers was equally unpersuasive. When the officers told Mr. Grace "you know it's kind of suspicious that you're driving around in somebody else's car," they were simply being dishonest. Even Frese and Lester themselves did not really believe there was anything suspicious about that fact. The officers were simply fabricating any excuse they could come up with in order to coerce the Plaintiff into consenting to let them search the car. The officers' own actions demonstrated that they weren't really worried about the ownership of the vehicle. Mr. Grace gave them an entirely plausible explanation for his rightful authority to be driving the car. He told the exact same explanation, over and over, without any change or inconsistency. He

described when and where he got the car, who it belonged to, why he was using it, and when he was returning it. He told them the owner's name, which matched their own check of the license plate. He offered to show them the registration and proof of insurance, but they declined. He offered to call Mr. Florence right then and there, to confirm his authority to be driving the vehicle. They declined. He offered to give them Mr. Florence's phone number so that they could verify it. They declined to do so. This totality of circumstances, all of which are on video and indisputable, confirm two things: (1) there was no reasonable basis to be suspicious about Mr. Grace driving Mr. Florence's car, and (2) the officers weren't really concerned about that issue at all. It was just a pretext used by the officers in an attempt to pressure Mr. Grace into relinquishing his constitutional rights.

61. Finally, the officers pointed to the fact that Mr. Grace had been observed pulling to the curb briefly, then circling around on the connecting streets, coming back up Mulford Road the other direction, and stopping again in the parking lane. They claimed that Mr. Grace possibly made those driving maneuvers in order to avoid the police. The officers argued that this was suspicious conduct which reasonably suggested drug crimes. It was not. It was the most commonplace of normal occurrences in that location. This was a residential street immediately adjacent to a heavy commercial strip on Grandview Avenue, and an area where some of the side streets also had limited parking for local residents only. There was nothing about making multiple stops, or several turns before parking, that was suspicious.

62. Furthermore, the actions of Defendants Frese and Lester suggest that they were not really suspicious of the Plaintiff's driving pattern at all. Mr. Grace gave them a detailed, specific, logical explanation for his driving maneuvers. He explained that his first

28

stop had been to locate his friend Mr. Gould's address on his phone.  He explained that he had circled around and stopped in this present parking spot because it was close to his destination. He pointed out Mr. Gould's house to them, and they could have verified his statements simply by walking across the street and speaking to Mr. Gould.  When Mr. Grace suggested that Mr. Gould be called to come over to the scene, the officers told him not to do that.  In short, the officers showed no interest whatsoever in checking out Mr. Grace's explanation for his driving movements and his presence at that location.  If the officers had truly found Mr. Grace's explanation to be suspect, they would have checked it out.  These circumstances reveal not only that there was nothing suspicious about the manner of the Plaintiff's driving or stopping. They also reveal that the officers themselves had no good-faith belief that Mr. Grace's driving or pulling over was indicative of crime. This was also just a pretext used to accomplish the officers' goal of conducting a vehicle search.

63. The four (4) factors mentioned by Defendants Lester and Frese as the justification for their crime-related detention of Mr. Grace did not constitute reasonable, particularized suspicion of criminal wrongdoing, either individually or collectively.  But this was not just a misjudgment by the Defendants.  Something much more improper and disturbing was actually going on here.  These officers had decided to stop Mr. Grace and question him before he even parked at the curb.  They were trying to catch up to him as he drove down Mulford Road.  This was just an intentional "fishing expedition". Officers Lester and Frese noticed Mr. Grace while he was still driving, and decided to pull him over so they could conduct a field training exercise in order to give the new officer practice in detentions and vehicle searches.

29

#### 4. Defendant Dollmatsch's Fabricated Drug Dog "Alert"

64.     The Columbus K-9 Unit began its participation in this detention approximately 23 minutes after the seizure had begun.   The K-9 Unit consisted of Defendant John Dollmatsch, a Columbus police officer who was the "handler", and "Kenzi", a dog who had been trained in drug odor detection.   Dollmatsch and Kenzi have worked together as a team since they began in 2014.   Dollmatsch has always been Kenzi's handler.

65.     Dollmatsch and Kenzi have done regular training exercises, usually on a weekly basis, since they first began their training together.   They have been deployed to conduct hundreds of narcotics drug sniffs of premises, vehicles and containers over the past five years.   Kenzi's trained "alert" behavior is to scratch vigorously at an area where he smells the odor of narcotics.

66.     When Defendant Lester saw the marked Columbus Police K-9 vehicle approaching, he moved Mr. Grace away from the location where he had been standing at the rear of his car.  Mr. Grace was moved onto the sidewalk, searched by Lester, and then left up on the grass of an adjacent yard, under the supervision of Grandview Heights Officer Patricia Garner.   Defendant Lester then returned to the area in front of the cruiser, behind Mr. Grace's car, and he met with Officer Dollmatsch.

67.     Lester spoke to Dollmatsch for about 25 seconds.   This conversation occurred out of earshot of Mr. Grace.  This conversation was also not audibly recorded on the cruiser dashboard camera/microphone system.  Officer Lester did all of the talking.  He can be seen at one moment pointing along the driver's side of Mr. Grace's car.  Defendant Dollmatsch is seen nodding in response.   After this brief conversation, Dollmatsch approached the car.  Kenzi was on a leash.

30

68.     The handler Mr. Dollmatsch first led Kenzi to the front of the subject vehicle, and then turned the dog and brought him to the front corner of the car on the driver's side. He then led the dog along the driver's side from the front to about the rear tire area.  The officer walked backwards, a couple feet away from the car, and Kenzi walked along the length of the car, with his head 1-2 inches away, actually touching the car at times, as he sniffed the driver's side of the vehicle.  Kenzi did not stop, or turn and focus on any location, and he did not jump up on the car or scratch, at any time during this first sniff of the driver's side of the vehicle.  In other words, he did not "alert".  Also during that first pass, Defendant Dollmatsch held his right hand out and away from his body, but he never reached out and touched the vehicle.

69.     Next, Dollmatsch led Kenzi away from the car, around in a circular fashion and they returned to the front corner of the vehicle on the driver's side.  They proceeded to conduct a second sniff along the driver's side of the car, from front to rear.  Again Officer Dollmatsch walked backwards, watching the dog, with his right hand away from his body in sort of a leading gesture, but never touching the vehicle.  Again Kenzi walked along the car with his nose right up against it, and sniffed that side from front to back.  And again on this second pass, the dog walked the entire length of the car and never stopped, or turned to focus on any location, or jumped up on the car, or scratched.

70.     When they reached the rear corner of the driver's side for the second time, Officer Dollmatsch had Kenzi continue around the car, sniffing across the rear/trunk area, turning left and continuing to sniff along the entire passenger side from rear to front. Dollmatsch then brought Kenzi across the front bumper/hood area and back to the left front corner of the vehicle.  As he had on the driver's side, Kenzi similarly showed no reaction

31

to the rear, the passenger side, or the front of the vehicle. He did not stop, focus on any particular area, lift his front paws up onto the car, or scratch.

71. Defendant Dollmatsch immediately began a third pass along the driver's side of the vehicle. This one went exactly like the first two. Dollmatsch walked backwards, holding the leash in his left hand and watching Kenzi. The dog was between Dollmatsch and the vehicle, head up, nose sniffing the car. For the third time Kenzi sniffed the entire driver's side and did not alert. The dog walked the length of the car without stopping, or getting up on the car, or scratching. When Kenzi got to the rear of the passenger side on this third pass he turned his face to the right, just as he had on the first pass, and began to walk away from the car.

72. This time, however, Defendant Dollmatsch transferred the leash from his left to his right hand, and pulled the leash upward and back toward the car, pulling Kenzi back toward the car as well. As he turned Kenzi back to the vehicle Dollmatsch reached his left hand out and tapped on the driver's side door. Kenzi saw this and instantly jumped up against the car, placing his front paws on the exact area that Dollmatsch had tapped less than one second before. The dog did not remain in that position, and he did not scratch the car at all. He just jumped up in response to Dollmatsch's cue, and then immediately dropped back to the ground, turned his back on the vehicle again, and began to walk away.

73 When Kenzi turned away Dollmatsch pulled him back to the car, reached out with his left hand again, and tapped on the driver's side door area for the second time, this time a little lower than the first one. Kenzi again saw this cue and instantly responded by jumping up against the car and placing his paws above the spot where Dollmatsch had tapped.

32

74.     Dollmatsch then led Kenzi as they circled around the rear of the car, then along the passenger side from back to rear, and then across the front of the car.  Kenzi sniffed the vehicle along those areas, but Dollmatsch never tapped on or otherwise touched the car, and Kenzi did not stop, or lift up onto the car, or scratch.

75.     Finally, Dollmatsch brought Kenzi around for a fourth and final sniff of the driver's side.  Walking backwards as he moved from front to back along the driver's side of the vehicle, holding the leash in his left hand, Dollmatsch watched Kenzi sniff that side again with no reaction.  The dog walked right by the area where he had previously jumped up onto the car in response to his handler's signal, but sniffed it without any response, attention or reaction of any kind.  When he arrived at the rear of the vehicle, Kenzi once again turned to his right, away from the car, and took three or four steps in that direction. And once again, Officer Dollmatsch switched the leash to his right hand, shortening it, pulled the dog back to the car, and reached out and tapped the car with his left hand.  In response to this cue Kenzi immediately did what he had done twice before, raised his paws up onto the vehicle in the exact area indicated by Dollmatsch, and then, without scratching or pausing on the car, dropped back down to the ground.

76.     Officer Dollmatsch led Kenzi away from Mr. Grace's vehicle.  As he did so he turned and looked at Officer Lester, and said something to Lester which is inaudible on the video.  Dollmatsch then took the dog, secured him in the Columbus K-9 Unit vehicle, and returned to join the other officers.

77.     This was not a legitimate use of the drug sniffing dog.  Kenzi did not ever give an uncoached "alert" by jumping up and scratching vigorously at an area where he thought he smelled the odor of narcotics.  On the contrary, the dog had sniffed along the driver's

33

side of the vehicle four times, walking past the open driver's door window, and past the driver's door seam, without giving his trained alert response on any of those passes. Neither had he alerted during his multiple sniffs of the rear, passenger side, or front of the vehicle.

78.     Rather this was a consciously and intentionally rigged performance, where the handler purposely cued the dog to do an act which gave the appearance of a real drug alert.  The total time that the dog conducted the drug sniff of the car was about 1 minute 15 seconds.  In all of that time Kenzi never once alerted to the presence of drug odor on his own.  On the other hand, each and every time that Defendant Dollmatsch directed the dog to a particular location on the car and tapped there, Kenzi immediately raised up, put his front paws on the car at exactly the spot where the handler had given the cue, and then dropped back to the ground.  These were not coincidences, they were intentionally misleading directions for the purpose of fabricating a false "positive hit".  Dollmatsch began using these cues after the dog had been sniffing the car for about 40 seconds without indicating any response.  These cued deceptions were done in order to create the false appearance of probable cause to justify a search of the vehicle.

79     Defendant Lester had observed the drug sniff and knew exactly what had occurred, but he reported to Officer Frese that "the dog hit on the driver side door over here."  Dollmatsch also reported falsely that "Yeah, he kept on going up to that rear driver side door and then when he got up, his nose up in the window he started coming in through the window, so . . ."

### 5.  A Thorough Vehicle Search Reveals Nothing

80.     For a period of 12-13 minutes, all three Defendant police officers searched

34

the Hyundai. They combed the front seat area, searched under the seats, in the steering column, under the dashboard, went through the glove compartment, two officers working one on each side. They pulled out fuses and checked the fuse panel. They did an equally exhaustive search of the back seat area. They opened the gas cap and searched under and inside of it. While Frese and Lester worked on the interior, Dollmatsch popped the trunk and searched it extensively. He opened bags, suitcases, everything in there, and searched through them meticulously. Their combined searches were in vain. There were no drugs in the car anywhere. There were no firearms and no contraband of any kind.

81.     During the search, Defendant Lester gave training tips to Officer Frese concerning the techniques he should use for conducting a drug search of a vehicle. For example, while they were going through the car interior, Lester told Frese that "something else you wanna keep an eye out for" was any sign "to indicate that a panel was freshly removed or something like that."

82.     The officers eventually abandoned their search. Officer Dollmatsch left. Defendants Frese and Lester finally filled out a traffic ticket, including the discussion described earlier about what ordinance they should charge Mr. Grace with violating. These Defendants scheduled a court date only six days later, and they seemed confident that Mr. Grace would not return to contest their traffic charge:

| | |
|---|---|
| Frese:. | . . Grandivew Court, do I use the, do I have to use the 28th, or can I use the [December] 12th? |
| Lester: | Uh, it's the 22nd now, so . . . |
| Frese: | It's . . . 6 days . . .is that still good? |
| Lester: | Yeah, so use the 28th. |
| Frese: | Okay. |
| Lester: | And then . . . not that I think he's going to, but if he questions how fast that is, which I, I ain't worried about it for him 'cause he's from out of town anyways, but if he questions if he can try |

> goin back, then that's the court date for him, and that's the one we have to give him.

Officer Frese pointed this out to Mr. Grace when he delivered the citation:

> Frese: What you can do . . . if you elect to, if you pay this out, you have until 11/28/17. . .and on the back of it here it explains our fines and pay out . . . So you have a chance to pay it out . . .it's a payable citation. If you feel that you were wrongfully cited, you also have a court date here you can show up at, 11/28/2017, 1:00p.m., Grandview Mayor's Court.

83. During the few minutes that the Defendants were filling out the traffic citation, the Plaintiff's friend from across the street walked over to the scene. This was Attorney Craigg Gould. Mr. Gould approached the car to talk with Mr. Grace, but the officers exited their cruiser and prohibited them from speaking. Frese said, "Hey . . .sir . . .sir". Mr. Gould explained "I'm his attorney". Frese responded, "Okay, great, come over here and I'll talk to you". Without being asked, Officer Frese began to justify their detention of Mr. Grace, listing the same factors they had previously relied upon. When he told Mr. Gould, "and he's got a air freshener there uh, on his left, like by the parking brake, and I'd never really seen that before . . .it's a, uh, an indicator of, uh. . . cover up. . .", Mr. Gould laughed. Frese then lied to Mr. Gould, telling him this: "Well, to be fair, he's driving somebody else's car who he can't tell me who it was at the time." Mr. Gould asked, "Is he free to go then." Defendant Lester told him, "Not yet." Shortly thereafter Mr. Grace was served with the citation and told he was now free to go. He had been in custody for 50 minutes.

### (6) Mr. Grace's Damages

84. The said acts by the Defendants as described above proximately caused Mr. Grace to suffer extensive and serious damages. Those damages were both monetary and

36

non-monetary.  Some of those damages continue to this day and are ongoing.

85.     Mr. Grace experienced a deprivation of his liberty during the entirety of the detention.  He had been exercising his right under the Constitution to move about freely, without government interference, when suddenly and completely unexpectedly, his freedom to go where he wished and engage in his chosen, lawful activities was terminated by armed police officers.

86.     Mr. Grace was forced to stand outdoors, in sub-freezing temperatures, during most of the time that he was detained.  This resulted in increasingly severe physical suffering and discomfort.  Throughout that time he was denied the opportunity to put on his coat, and repeatedly ordered by the police officers to keep his unprotected hands out of his pockets, exacerbating his physical suffering.

87.     Mr. Grace was increasingly fearful as the detention continued.  When the police officers told him that they suspected him of "drug trafficking", the severity of this situation became extremely threatening and intimidating to the Plaintiff.  Because there was no rational basis for suspecting him of crimes involving narcotics, Mr. Grace feared that these police officers were considering, or were intending, to frame him for drug trafficking.  He was understandably terrified that these police officers might plant evidence in the car and then arrest him for serious felony crimes of which he was entirely innocent.  It would then be his word against theirs, and he might be convicted of crimes he had not committed.  Mr. Grace was not only wary of the devastating effect that such an accusation would have on his own life, but also the effect that it would have on his family.

88.     Mr. Grace was standing in a position where he could view Defendant Dollmatsch conduct the drug sniff.  As an attorney with prior experience in criminal cases,

37

the Plaintiff was generally familiar with this procedure.  Mr. Grace watched as the drug-sniffing dog was led around the car repeatedly, was directed to sniff the driver's side over and over again, and did so without any signs of an alert signifying the presence of narcotic drugs.  But then when Mr. Grace saw Defendant Dollmatsch pull the dog back to the car and cue the dog to react, and the dog instantly rose up onto the car at that spot, the Plaintiff's heart sunk.  He sincerely believed that this rigged drug sniff would be followed by the "discovery" of illegal drugs in the car, and that he would be arrested, falsely accused, and taken away. This was a horrifying fear, the likes of which Mr. Grace had never before experienced.

89.     During this detention Mr. Grace was also forced to submit to a full-body search of his person, during which he was held forcefully in a control position, and touched and/or rubbed, front and back, from top to bottom, by Officer Lester.  This search was conducted in public, in front of the other officers, passersby, and those persons watching this police activity from their homes.  This was an embarrassing and demeaning experience to the Plaintiff.

90.     When Mr. Grace was finally released from police custody, he was shaking and distraught.  He walked away from the scene with his friend Mr. Gould.  Before this incident with the police, their original plan had been that the Plaintiff would spend some time socializing with Mr. Gould and two of his nephews, and then he would drive to Athens to stay with his older brother.  However, Mr. Grace was far too upset to drive.  He called his brother, explained what had happened, and advised that he was going to stay at Mr. Gould's home that night.  The Plaintiff did try to socialize with his friend, but he was extremely agitated.  He could not calm down, or stop thinking about what the Defendants

had done to him. He found that he could not stop talking about it, although his friends tried to direct the conversation elsewhere.

91.     Mr. Grace tried to sleep that night but was largely unable to do so.  The following morning was Thanksgiving. His family was getting together in Circleville that day, and Mr. Grace went to join them.  On the way, a Pickaway County Sheriff's cruiser happened to be in traffic behind the Plaintiff's vehicle.  This caused Mr. Grace to immediately feel the same terrified feelings he had felt while in custody of the Defendants the night before.

92.     At the family gathering that day, Mr. Grace's parents and brothers could all see how upset he was.  Although the Plaintiff tried his best to act normally, he remained exceptionally agitated and was unable to fully hide it.  Mr. Grace's whole trip to Ohio had been ruined, and he felt he had also ruined it to some extent for the family as well.

93.     Mr. Grace was required to obtain counsel in order to defend himself against the groundless traffic citation. His counsel attempted repeatedly to resolve the matter, unsuccessfully. The Plaintiff had told his attorney the details of the incident, including the extensive drug investigation and the staged drug sniff "alert", so it was necessary for the attorney to file motions to preserve the audiovisual evidence.  The attorney was required to make 8 or 9 court appearances, first in the Grandview Mayor's Court and then in the Franklin County Municipal Court, all in the hope that the Defendants would dismiss the case without forcing Mr. Grace to return from California.  But the case was not dismissed. This resulted in two damaging consequences for Mr. Grace.  First, he incurred legal fees of several thousand dollars.  And second, this citation remained pending for seven-and-one-half months.

94.     The case was firmly set for trial on July 24, 2018.  In an effort to mitigate his damages, Mr. Grace personally prepared a lengthy letter to the City Attorney for the City of Grandview Heights, requesting that the case be dismissed before the Plaintiff's trial date. This would avoid the time and expense of Mr. Grace traveling to Ohio to be present in court.  The letter was sent on July 9, 2018. The Defendants never responded, so Mr. Grace was required to fly to Columbus, meet with his attorney to prepare for trial, and then attend the trial.  When he showed up for trial, the case was dismissed. Mr. Grace incurred several thousand dollars in monetary losses as a result, including round trip flights between San Diego and Columbus, hotel accommodations, and the amount of his time consumed in defending the case brought against him by the Defendants.

95.     Most significantly, this violation of his constitutional rights has had a profound and lasting negative effect on Mr. Grace personally.  The frightening threat of false accusations, and the sense of powerlessness from being bullied by intimidating police officers, have changed the Plaintiff in important and lasting ways.  Mr. Grace is infuriated by the fact that he was interrupted in his travels, held by police against his will, and forced to relinquish to police officers his right to privacy in his automobile and luggage, for no better reason than to provide the officers with an opportunity to practice their drug interdiction techniques.  He has experienced, and continues to repeatedly experience, stress, anxiety, anger, and other emotional upset and distress as a result of the Defendants' actions.

96.     All of the said acts by the Defendants were done knowingly, recklessly, intentionally and/or maliciously, and with reckless or intentional disregard for the Plaintiff's constitutional rights.

## FIRST CLAIM - UNLAWFUL TRAFFIC STOP

97.     Said acts by Defendants Lester and Frese constituted an unlawful traffic stop of the Plaintiff, conducted without probable cause, in violation of the Fourth Amendment and 42 U.S.C. §1983.

## SECOND CLAIM - UNLAWFUL DETENTION FOR A CRIMINAL INVESTIGATION

98.     Said acts by Defendants Lester, Frese and Dollmatsch constituted an unlawful criminal detention of the Plaintiff, conducted without reasonable and particularized suspicion, in violation of the Fourth Amendment and 42 U.S.C. §1983.

## THIRD CLAIM - UNREASONABLE SEIZURE IN SCOPE AND MANNER

99.     Said acts by Defendants Lester, Frese and Dollmatsch, constituted a seizure of the Plaintiff which was unreasonable in its scope and length, and unreasonable in its manner, in violation of the Fourth Amendment and 42 U.S.C. §1983.

## FOURTH CLAIM - UNLAWFUL SEARCH OF THE PLAINTIFF'S PERSON

100.    Said acts by Defendant Lester constituted an unlawful search of the Plaintiff's person, in violation of the Fourth Amendment and 42 U.S.C. §1983.

## FIFTH CLAIM - UNLAWFUL VEHICLE AND PROPERTY SEARCH

101.    Said acts by Defendants Lester, Frese and Dollmatsch constituted an unlawful search of the Plaintiff's vehicle, luggage and personal effects, in violation of the Fourth Amendment and 42 U.S.C. §1983.

## SIXTH CLAIM - RETALIATION

102.    Defendants Lester and Frese retaliated against the Plaintiff, by extending the

length of his seizure and by charging him with a traffic offense, due to the Plaintiff's refusal to consent to a voluntary relinquishment of his constitutional rights, and due to his statements questioning the Defendants' actions. The Defendants' retaliatory conduct was an adverse action such that it would deter and chill a person of ordinary firmness from continuing to engage in that constitutionally protected activity; and it was substantially motivated as a response to the Plaintiff's exercise of constitutionally protected conduct. Said acts constituted violations of the First and Fourth Amendments, and 42 U.S.C. §1983.

## SEVENTH CLAIM - FABRICATION OF EVIDENCE

103. Said acts by Defendants Dollmatsch and Lester constituted fabrication of evidence, in violation of the Fourteenth Amendment and 42 U.S.C. §1983.

## EIGHTH CLAIM - MALICIOUS PROSECUTION

104. Said acts by Defendants Lester and Frese constituted malicious prosecution, in violation of the Fourth Amendment and 42 U.S.C. §1983.

## NINTH CLAIM - EMPLOYER LIABILITY

105. The said acts by Defendants Lester and Frese were proximately caused by customs and policies of Defendant City of Grandview Heights and the Grandview Heights Police Department, including the failure to train, supervise and discipline police officers on the specific legal limitations upon their authority to conduct searches and seizures of individuals; the acceptance and ratification of unauthorized searches and seizures of drivers and others; and the customary unlawful detention of drivers for the purpose of engaging in improper exploratory criminal investigations.

## TENTH CLAIM - MALICIOUS PROSECUTION UNDER OHIO LAW

106.    Said acts by Defendants Lester and Frese constituted malicious prosecution pursuant to Ohio law.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, punitive damages, reasonable attorney fees, other litigation costs, and such further relief as may be deemed appropriate.

Respectfully submitted,

*/s/ James D. McNamara*
James D. McNamara        (0002461)
Trial Attorney for Plaintiff
88 E. Broad Street, Suite 1350
Columbus, OH 43215
(614) 464-2770
psilbach@yahoo.com

## JURY DEMAND

The Plaintiff hereby demands a jury of eight (8) persons to hear and decide this case.

Respectfully submitted,

*/s/ James D. McNamara*
James D. McNamara        (0002461)
Trial Attorney for Plaintiff
88 E. Broad Street, Suite 1350
Columbus, OH 43215
(614) 464-2770
psilbach@yahoo.com

43